# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-03014 -SKC

TINA PETERS

     Plaintiff,

v.

UNITED STATES OF AMERICA,
MERRICK B. GARLAND, Attorney General of the United States in his official capacity,
JENA GRISWOLD, Colorado Secretary of State, in her official capacity, and
DANIEL P. RUBINSTEIN, District Attorney of the Twenty-First Judicial District, in his official capacity,

     Defendants.

# PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
# AND SUPPORTING MEMORANDUM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES     (ii)

INTRODUCTION     (1)

BACKGROUND     (2)

(ARGUMENT

I.  PRELIMINARY RELIEF IS WARRANTED     (9)

    A. Peters Is Likely to Prevail on the Merits     (9)

      1. Peters Has Presented Valid *Prima Facie* Claims of Retaliation under the First and Fourteenth Amendments     (12)

       a.  Constitutionally protected activities     (13)
       b.  Irreparable injury     (18)
       c.  Retaliatory motivation     (20)
       d.  Bad faith     (23)
       e.  Peters is unlikely to receive a fair trial in state court     (35)

    B.  Peters Will Suffer Irreparable Injury Without Preliminary Relief     (37)

    C.  The Balance of Equities Favors Peters     (38)

CONCLUSION     (38)

CERTIFICATE OF LENGTH     (40)

CERTIFICATE OF SERVICE     (40)

TABLE OF AUTHORITIES

**Cases**

*ACLU of Illinois v. Alvarez,*
*Amalgamated Fed. Emp. Union Local 590 v. Logan Valley Plaza, Inc.,*
    391 U.S. 308 (1968)
*Awad v. Ziriax,*
*AT&T Co. v. Winbachand Conserve Program, Inc.,* 421 F.3d 1421 (3d Cir. 1994)
*Bass v. Richards,* 308 F.3d 1081 (10th Cir. 2002)
*Benisek v. Lamone,* 138 S.Ct. 1942 (200
*Brown v. Mississippi,*
*Chaplaincy of the Full Gospel Churches v. England,* 454 F.3d291 (D.C.Cir. 2006)
*Cunningham v. Neagle,* 135 U.S. 1 (1890)
*Douglas v. City of Jeannette,*
*Duncan v. Louisiana,* 391 U.S. 145 (1965)
*Durham v. Jones,*
*Elam Constr., Inc. v. Reg. Transp. Dist.,* 129 F.3d 1343 (10th Cir.
*Fitzgerald v. Peek,* 6636 F.2d
*Free the Nipple-Fort Collins v. City of Fort Collins,*
*Garcia v. City of Trenton,* 348 F.3d 726 (8th Cir. 2003)
*Gessler v. Colo. Common Cause,* 327 P.3d 232 (Colo. 2014)
*Hamling v. United States,* 418 U.S. 87 (1974)
*Hanlen v. Gessler,* 333 P.3d 41 (Colo. 2014)
*Harmaon v. City of Norman,* 981 F3d 1148 (10th Cir. 2000)
*Harris v. People,*
*Heideman v. s. Salt*
*Irizarry v. Yehia,*
*Kikumura v. Hurley,*
*Ku-Kluz Klan Cases,*
*Kugler v. Helfant,*
*McCullogh v. Maryland,* 17 U.S> 316 (1819)
*McDonnell v. United States,*
*McIntyre v. Ohio Elec. Board,*

*Moore v. Sims,* 442 U.S. 415 (19  )

*Nken v. Holder*

*O Centro Espirita*

*People v. Brown,* 562 P.2d 754 (Colo. 1997)

*People v. Buckellew,*

*People v. Dilger,*

*People v. Gonzales,* 534 P.2d 626 (Colo. 1975)

*People v. Janousek,* 871 P.2d 1189 (Colo. 1994)

*People v. Johnson,*

*People v. Peters,* Case No.

*Phelps v. Hamilton,*

*Pickering v. Bd. Of Educ.,*

*Planned Parenthood Ass'n of Utak v. Herbert,* 828 F.3d 1245 (10th Cir. 2016)

*In ree Quarles,*

*Rankin v. McPherson,*

*Roberts v. U.S. Jaycees,* 468 U.S.

*RoDa Drilling Co. v. Siegal,*

*Roman Cath. Diocese of Brooklyn v. Cuomo,*

*Slaughter-House Cases,*

*Trant v. Oklahoma,* 754 F.3d 1158 (10th Cir. 2014)

*Utah Licensed Beverage Ass'n v. Leavitt,* 656 F.3d 1061 (10th Cir. 2001)

*United States v. Alvarez,*

*United States v. Classic,*

*United States v. Hathaway,*

*United States v. Kalu,*

*United States v. P.H.E., Inc.,* 965 F.2d 848 (10th Cir.

Verlo v. Martinez, 820 F.3d 1113 (10th Cir. 2016)

*Winter v. NRDC,* 555 U.S.

*Worrell v. Henry,* 219 F.3d

*Wyoming v. Livingston,* 443 F.3d 1211 (10th Cir. 2006)

*Younger v. Harris,* 401 U.S. 37 (1971)

4

**Statutes**

42 U.S.C. § 1983
52 U.S.C. § 20701
52 U.S.C. § 21801
C.R.S. §


**Secondary Sources**

WRIGHT, MILLER & KANE, FED. PRAC, & PROCEDURE
B. Covington, *State Official Misconduct Statutes and Anticorruption Statutes after Kelly v. United States,* 121 COLUM. L. REV. 273 (2021)
J. Harrison, *Reconstructing the Privileges and Immunities Clause,* 101 YALE L.J. 1385 (1993)

# INTRODUCTION

Pursuant to Fed.R.Civ.P. 65(a), Plaintiff Tina Peters moves this Court for an order enjoining, pending the resolution of Peters' claims in this action, Defendant District Attorney Daniel P. Rubinstein ("Rubinstein") from conducting, continuing, or participating in any way in proceedings in *People v. Tina Peters,* Case No. 22CR371 (Dist. Ct. Mesa Co.), or any other criminal proceedings against or harassment of Peters.

The grounds for this Motion, set out in more detail below, are that these criminal proceedings and investigations have been and will continue to be taken by Rubinstein in bad faith to punish Peters, because in 2021 she made a legal forensic image of the Mesa County Election Management System ("EMS") server. The forensic image includes digital election records of the November 2020 election and the Grand Junction municipal election in 2021. If Peters had not made the forensic image, those digital election records would have been irretrievably lost. Federal and state law required Peters to preserve digital election records for specified periods: 52 U.S.C. § 20701 (22 months); CRS 1-7-802 (25 months). The federal statute carries a criminal penalty.

By using a criminal prosecution to retaliate against Peters, Rubinstein has violated, and threatens to continue violating Peters' First Amendment rights to

speak out, to investigate and report official misconduct, to petition the government for the redress of grievances, and to associate with others. Rubinstein's conduct has also violated, and threatens to continue violating Peters' privileges and immunities under the Fourteenth Amendment to comply with federal law and engage in the administration of government functions free from retaliation by state officials, and her Fourteenth Amendment right to due process of law, which shields a U.S. citizen from the weaponizing of state government instrumentalities, including criminal prosecution, to retaliate against that citizen for her exercise of First Amendment rights and for her compliance with federal law.

## BACKGROUND

On April 30, 2021, Colorado Secretary of State Jena Griswold (Griswold) sent an email directing Peters to participate in installing a "Trusted Build" upgrade to Mesa County's EMS server.  The email is Exhibit 1.

Peters, then Mesa County Clerk and Recorder and its designated election official, had received reports from voters who claimed irregularities in recent elections.  In an April 2021 telephone call, David Stahl, an employee of Dominion Voting Systems, Inc. ("Dominion"), advised Peters that the Trusted Build would delete software that allowed the system to read certain ballots.  Peters understood that erasure of this information during the Trusted Build installation would make

results of the 2020 and 2021 elections impossible to verify. [Peters Declaration, Ex 2, ¶ 7].

Peters knew that if records of the elections were erased, they would be irretrievably lost, and it would be impossible for her as county clerk to conduct an audit or accurate recount of the most recent elections.  As Peters explains in her Declaration, she was forced to choose between (1) violating election records preservation laws or (2) following the law by making a forensic image of the server before the Trusted Build installation took place.  Peters chose to follow the law.  [*Id* ¶¶ 6-24].

Peters engaged a qualified consultant named Hayes to make a forensic image of the EMS hard drive.  A forensic image is a bit-for-bit unalterable (read only) copy of a hard drive.  It does not modify any data.  It causes no harm to the voting system. [*Id* ¶¶ 17-22].

Griswold's email specified that she would limit access to the Trusted Build installation to employees of Griswold, the county clerk, and Dominion.  At the time, no state law or regulation prohibited Peters from having a qualified consultant present to observe the Trusted Build installation [*Id* ¶ 16].  To circumvent Griswold's email, Peters arranged for Hayes to use the access badge of Gerald Wood, another consultant.  Wood gave permission for his access badge to

be used by Hayes. Whenever Hayes was in a secure area, he was supervised by an employee with authorized access in compliance with Election Rule 20.5.3(b). [*Id* ¶¶ 25-28].

Peters and Hayes made the first forensic image on May 23, 2021, two days before the Trusted Build installation. The forensic image preserved election records and software from the 2020 and 2021 elections. On May 25, Griswold's agent erased the entire EMS server during the Trusted Build installation. Peters and Hayes made a second forensic image on May 26, immediately after the Trusted Build. The second forensic image captured only the new software installed by Griswold. All prior election records had been erased from the server during the Trusted Build installation. [Declaration of Douglas Gould, Ex. 18 at 11]. If Peters had not made the forensic image on May 23, records of the most recent elections would have been irretrievably lost. [Ex. 2 ¶ 26 and 31].

Qualified cyber and database experts analyzed the forensic images. Cybersecurity expert Douglas Gould concluded that the Trusted Build erased election records of the November 2020 election and the 2021 municipal election (as Peters had rightly anticipated) [Ex. 18 at 11]. Gould also found that normal operation of the voting system during an election overwrote records that were required to be preserved for future audits. [*Id* at 9-10]. Two other experts, Walter

C. Daugherity Ph.D. and Jeffrey O'Donnell, concluded that the Mesa County disk drive images revealed an unusual phenomenon that occurred during both the November 2020 General Election and the April 2021 Grand Junction municipal election: After some of the ballots were processed and their information recorded in a set of Microsoft SQL database tables for the respective election ("Set 1"), no further data were entered in Set 1 even though ballot processing was not complete. Rather, data from processing additional ballots were entered into a separate, newly created set of tables ("Set 2"). Further, some but not all the data from Set 1 was copied into Set 2. Accordingly, neither Set 1 nor Set 2 contained all the data from counting all the ballots. Because the creation of Set 2 hid Set 1 from election workers, breaking the chain of custody and violating federal auditability requirements, election officials had no way to examine or review the ballots in Set 1 which were not copied to Set 2. This unexpected behavior by the software calls into question the integrity of the vote-counting process and the validity of the election results. [Declaration of computer science expert Walter C. Daugherity, Ph.D. Ex 19 ¶ 15].

On August 10-12, 2021, Peters attended a televised symposium in Sioux Falls, South Dakota sponsored by Michael Lindell [Ex 2 ¶33]. Peters made a speech in which she advocated for election transparency and criticized Griswold.

On or about August 2, 2021, Griswold learned of the making of the first forensic image. Even though no statute, rule, or order was violated by creation of the forensic images, Griswold ordered her staff to initiate an investigation of Peters, based on the justification that there had been a "security breach" [Exhibit 20, p. 2]. According to Rubinstein, he received a call on August 9 from Griswold's Deputy, Christopher Beall. Without showing probable cause that a crime had been committed, Beall urged Rubinstein to start a criminal investigation of Peters. [Rubinstein report, Ex. 21 at 2]. Rubinstein immediately began investigating Peters (*Id.).* Rubinstein contacted the FBI and urged the agency, without any proper cause, to participate in investigating Peters. [Rubinstein email, Ex 22].

Rubinstein acted in bad faith because he did not acknowledge or investigate Griswold's unlawful erasure of election records during the Trusted Build installation. Rubinstein was motivated, at least in substantial part, by an unlawful intent to punish Peters for the protected First Amendment acts of making and publishing the forensic image and to deter Peters from publicly asserting that Griswold had violated election records preservation laws.

Rubinstein's investigator signed an affidavit [before the judge presiding over Peters' criminal case], which stated falsely that Peters acted "unlawfully" when she made the forensic image [Ex 14 p. 9]. Griswold's Deputy Secretary of State

Christopher Beall admitted in testimony in another case that making forensic images was not prohibited by law.  [Exhibit 15 at 2, L. 14-17].  Rubinstein's investigator misrepresented to the Court that Peters' deputy, Belinda Knisley, had stated during her proffer interview that Peters had told her to lie. [Ex. 14 at 13].

Rubinstein and Griswold have claimed that the directive in the April 30, 2021, email from Griswold's office requiring Peters to "[b]ackup any election projects on your voting system" [Ex. 1] assured the preservation of all records subject to the election records preservation statutes. [Ex. 23 at 3, Rubinstein email to Ed Arnos]. That is not accurate; by design, the Trusted Build upgrade overwrote the entirety of the voting system software and data on the Mesa Country EMS server.  Records essential to conducting a post-election audit or recount, which were overwritten by the Trusted Build installation, are not included among election project records. [*Id* at 1-2; Arnos Declaration, Ex. 24 ¶ 8; Ex. 2 ¶ 13].  To conceal her own wrongdoing, Griswold continues to claim that Peters acted unlawfully by making the forensic image [Griswold tweet 11/25/23 Ex. 17].

Every voting system used in an election of a federal officer must meet federal requirements. 52 U.S.C. § 21081(a). Such requirements provide that the voting system must "produce a record with an audit capacity for such system." 52 U.S.C. § 21081(a)(2)(A), which includes "a permanent paper record with a manual

audit capacity." 52 U.S.C. §21081(a)(2)(B)(i). That record must be "available as an official record for any recount…." 52 U.S.C. § 21081(a)(20)(B)(iii). The deletion of the records on the EMS server made an audit of the 2020 and 2021 elections impossible. The purpose of the election records retention statutes is to assure that audits can be conducted. 52 U.S.C. § 21801(b)(1)(D). Election records are also generally subject to public inspection under the Colorado Open Records Act.

A Colorado statute provides that Voting System Standards adopted by the Federal Election Commission (now the Election Assistance Commission) apply to elections in the State. CRS 1-5-601.5. Those standards define "voting system" to include "the software required to program, control, and support the equipment that is used to define ballots, to cast and count votes, to report and/or display election results, and to maintain and produce all audit trail information." VSS 1.5.1. "All audit trail information spelled out in subsection 4.5 of the Standards shall be retained in its original format, whether that be real-time logs generated by the system, or manual logs maintained by election personnel." VSS 2.2.11. The Department of Justice has stated: "Jurisdictions must therefore retain and preserve records created in digital or electronic form." https://www.justice.gov/opa/press-release//file/1417796/download.

# III.
# PRELIMINARY RELIEF IS WARRANTED.

A request for preliminary injunctive relief must be evaluated under the four-factor test of *Winter v. NRDC,* 555 U.S. 7, 20 (2008). *Planned Parenthood Ass'n of Utah v. Herbert.* 828 F.3d 1245, 1252 (10th Cir. 2016). For Peters to obtain a preliminary injunction, she must establish: (a) that she is likely to succeed on the merits; (b) that she is likely to suffer irreparable injury unless the preliminary injunction is granted; (c) that the balance of equities tips in her favor; and (d) that the grant of an injunction is in the public interest. 828 F.3d at 1252. When defendants are government actors, the last two factors are considered together, *Nken v. Holder,* 556 U.S. 416, 435 (2009).

## A. <u>Peters Is Likely to Prevail on the Merits</u>.

It is sufficient to obtain a preliminary injunction for a movant to present a *prima facie* case on the merits. *Planned Parenthood Ass'n of Utah v. Herbert,* 828 F.3d 1245, 1252 (10th Cir. 2016). 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2948.3 (2014) ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning."). In the First Amendment context, this factor is often determinative because of the seminal importance to society of the interests at stake. *Verlo v. Martinez,* 820 F.3d 1113, 1126 (10th Cir. 2016); *see Dombrowski v. Pfister,* 380 U.S. 479, 486 (1965).

In order to obtain a preliminary injunction, plaintiffs must show that they are "substantially likely" to prevail. *Harmon v. City of Norman,* 981 F.3d 1141, 1146 (10th Cir. 2020). The preliminary relief sought by Peters requires that she satisfy a "heavier burden" regarding the likelihood-of-success and balance-of-harms factors because a preliminary injunction would grant her substantially the relief she could obtain after a trial on the merits. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 979 (10th Cir. 2004) (*en banc*) (*per curiam*), *aff'd sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal,* 546 U.S. 418 (2006). Peters must assert "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issue ripe for litigation and deserving of more deliberate investigation." *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1208 n. 3 (10th Cir. 2009). A grant of Peters' motion, therefore, requires "a strong showing" on each of those two factors. *Westar Energy, Inc. v. Lake,* 352 F.3d 1215, 1224 (10th Cir. 2009). Peters satisfies that heavy burden by her showing of a clear violation of her First Amendment rights and by the overriding importance of protecting free speech. *Dombrowski,* 380 U.S. at 489.

The Complaint asserts two claims. Count 1 applies to the Federal Defendants only and is not at issue in this Motion.  Count 2 asserts that agents of the State of Colorado violated 42 U.S.C. § 1983 by acting under Colorado law to

violate Peters' First Amendment and Fourteen Amendment rights. The claim relies on the well-settled rule that "[a]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." *Worrell v. Henry,* 219 F.2d 1197, 1212 (10th Cir. 2000); *see McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 357 (1995) ("[T]he purpose behind the Bill of Rights, and the First Amendment in particular [is] to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society."); *Smith v. Paul,* 258 F.3d 1167, 1176 (10th Cir. 2001); *Phelps v. Hamilton,* 59 F.3d 1058, 1066 (10th Cir.1995); *United States v. P.H.E., Inc.,* 965 F.2d 848, 853 (10th Cir. 1992).

*Ex parte Young,* 209 U.S. 123 (1908) is "the fountainhead of federal injunctions against state prosecutions." *Dombrowski,* 380 U.S. at 483. The Court in that 1908 decision concluded that federal intervention is justified to protect persons against state criminal proceedings that violate the Constitution. 209 U.S. at 156. In later decisions, the Court limited that holding in the interest of comity to cases in which irreparable injury can be shown. *E.g., Douglas v. City of Jeannette,* 319 U.S. 157 (1943). But in *Dombrowski*, the Court held that *Douglas* does not govern when a First Amendment violation would cause irreparable injury and that any

substantial impairment of the freedom of expression clearly shows irreparable injury. 380 U.S. at 489-90. The party suffering such injury need not await "the state court disposition and ultimate review by this Court of any adverse determination." *Id.,* at 486; *see* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 4251 (4/23 Update).

### 1. Peters Has Presented Valid *Prima Facie* Claims of Retaliation under the First and Fourteenth Amendments.

To establish a *prima facie* claim of unconstitutional retaliation for the exercise of a First Amendment right, Peters must offer evidence that (1) she was engaged in constitutionally protected activity, (2) Rubinstein's actions caused her injury that would chill a person of ordinary firmness from continuing that activity, and (3) Rubinstein's actions were substantially motivated as a response to Peters' protected activity. *Worrell,* 821 F2d at 1212. The requested injunctive relief would prohibit Rubinstein from continuing the criminal prosecution that is scheduled for trial in Mesa County District Court on February 24, 2024.   Peters meets her burden by showing a "strong likelihood" of prevailing on her retaliation claim. *Id.* at 980. The balance of harms is decidedly in her favor because the protection of First Amendment rights is a societal priority. *Dombrowski,* 380 U.S. at 486 ("For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser.").

### a. Constitutionally protected activities

Peters engaged in four constitutionally protected activities: (1) she exercised her right to free expression by speaking publicly about Griswold's violation of the election records preservation statutes and problems with computerized voting systems [Ex 2 ¶¶ 32, 33, 34, 55, 56]; (2) she exercised her right to freedom of association by enlisting and engaging other citizens who shared her views [*Id* ¶¶ 33, 34,]; (3) she exercised her right to make forensic images of public election records and to use the images to investigate government misconduct [*Id* ¶¶ 15-24]; and (4) she petitioned the government for redress of grievances by presenting reports of findings based on the images to the Mesa County Board of County Commissioners ("County Board") [*Id* ¶¶ 38, 48; Peters' petitions to the County Board are Exhibits 4 and 7]. Peters' public statements are protected by the Free Speech Clause of the First Amendment. *See Pickering v. Bd. of Educ.,* 391 U.S. 563, 573 (1988). Making forensic images of the EMS server is entitled to First Amendment protection. *See Irizarry v. Yehia,* 38 F.4th 1282, 1290-96 (10th Cir. 2022) (filming police to preserve evidence of misconduct is protected). Associating with others who share her concerns to advance a message that computerized voting systems are a threat to election integrity is an exercise of the freedom of association. *See Planned Parenthood Ass'n,* 828 F.3d at 1259.  Peters' submissions

of expert reports to the County Board with a request to stop using insecure computer voting systems is an exercise of the right to petition for redress of grievances. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

The subject matter of Peters' public statements and other protected activities constitutes an issue of profound public concern. *See Trant v. State of Oklahoma,* 754 F.3d 1158, 1165 (10th Cir. 2014). Misconduct by government officials and the integrity of the election process are also matters of profound public concern. *Durham v. Jones,* 737 F.3d 293, 296 (4th Cir. 2013) (misconduct); *Bass v. Richards,* 308 F.3d 1081, 1089 (10th Cir. 2002) (elections).

"The controversial character of the statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson,* 483 U.S. 378, 387 (1987). Peters' speech is constitutionally protected, even if Rubinstein disagrees with her point of view. *See United States v. Alvarez,* 5667 U.S. 709, 729 (2012) (plurality opinion); *id.,* at 739 (Breyer, J., concurring); *id.,* at 751-52 (Alito, J., dissenting). "[F]alsity alone may not suffice to bring the speech outside the First Amendment." *Id.,* at 719. Moreover, even within its narrow scope, the Privileges and Immunities Clause of the Fourteenth Amendment protects "the right of the citizen of this country…to engage in administering [the national government's] functions." *Slaughter-House Cases,* 83 U.S. 36, 79 (1872). *See also In re Quarles,*

158 U.S. 532, 535 (1895) ("Among the rights and privileges which have been recognized by this court to be secured to citizens of the United States by the constitution are … the right of every judicial or executive officer, or other person engaged in the service … of the United States, in the course of the administration of justice, to be protected from lawless violence."). Peters' efforts to comply with federal law surely qualify for protection as a privilege and immunity within the meaning of the Fourteenth Amendment, especially in the context of combating the potential corruption of elections, including a federal election. *Cf. United States v. Classic,* 313 U.S. 299, 316 (1941) ("That the free choice by the people of representatives in Congress … was one of the great purposes of our Constitutional scheme of government cannot be doubted. We cannot regard it as any the less the constitutional purpose or its words as any the less guaranteeing the integrity of that choice…."); *The Ku-Klux Klan Cases,* 110 U.S. 651, 666-67 (1884) ("In a republican government, like ours, … the temptations to control … elections by violence and by corruption is a constant source of danger…. [N]o lover of his country can shut his eyes to the fear of future danger from both sources.").

The privilege of a county official to faithfully comply with a federal law that is part of a federal regime advancing secure federal elections, and her concomitant immunity from state prosecution punishing that effort, is no novelty. Rather, it is a

proposition fitting comfortably within the long body of precedent of Supremacy Clause immunity that recognizes the immunity of federal officials from prosecution for state law violations caused by their execution of federal law. In *Cunningham v. Neagle,* 135 U.S. 1 (1890), the Supreme Court established that federal officers were immune from state prosecution for acts committed within the reasonable scope of their duties. The Tenth Circuit has likewise recognized that "Supremacy Clause immunity governs the extent to which states may impose civil or criminal liability on federal officials for alleged violations of state law committed in the course of their federal duties." *Wyoming v. Livingston,* 443 F.3d 1211, 1213 (10th Cir. 2006).

These principles apply with equal force to protect conduct by non-federal officials. The rule is that "states may not impede or interfere with the actions of federal executive officials when they are carrying out federal laws." *Id.,* at 1217. The animating principle is fundamental and long recognized in our constitutional law that "the states have no power … to retard, impede, burden, or in any manner control, the operations of the constitutional law enacted by congress to carry into execution the power vested in the general government." *Id.* (quoting *McCullogh v. Maryland,* 17 U.S. 316, 436 (1819)). Thus, it is the effective operation of federal law that is key, not the identity of the person executing it. Here, Peters was

attempting to faithfully assure the operation of the federal election records preservation statute, 52 U.S.C. § 20701, a legitimate enactment of Congress exercising the power vested in it by the Constitution.

"The question is not whether federal law expressly authorizes a violation of state law, but whether the federal official's conduct was reasonably necessary for the performance of his duties." *Wyoming v. Livingston,* 443 F.3d at 1227-28.  It is beyond doubt that a federal officer doing what Peters did would be immune from state prosecution for those acts, evaluating the reasonableness of those acts in light of "the circumstances as they appear[ed] to federal officers at the time of the act in question." *Id.*, at 1229. The fact that Peters was a county election official acting to assure compliance with a federal statute that expressly required that "every officer of election" preserve  "all records" of the 2020 election compels that result; she is immune from state prosecution for her acts done to comply with federal law.

Finally, it would seem undeniable that a baseless state prosecution as retaliation for Peters' efforts to comply with federal law is an utterly lawless undertaking, offending not only the Supremacy Clause, but also the most basic notions of due process protected by the Fourteenth Amendment. *Cf. Duncan v. Louisiana,* 391 U.S. 145, 149 (1968); *Brown v. Mississippi,* 297 U.S. 278, 285-87 (1936). After all, "The Due Process Clause prevents state activity that is, literally,

lawless."  John Harrison, *Reconstructing the Privileges or Immunities Clause*, 101 Yale L.J. 1385, 1454 (1992).

### b.  Irreparable injury

The second *Winter* factor requires Peters to show she is likely to suffer irreparable harm if preliminary injunctive relief is not granted. *Benisek v. Lamone.* 138 S. Ct. 1942, 1944 (2018). The violation of a First Amendment right constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("[T]he temporary violation of a constitutional right itself is enough to establish irreparable harm."); *Heideman v. S. Salt Lake City,* 723 F.3d 1114, 1145 (10th Cir. 2013); *Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001) ("When an alleged constitutional right is involved, most courts hold that no further of irreparable injury is necessary.").

To warrant a preliminary injunction, Peters' irreparable injury must be great and immediate. *Moore v. Sims,* 442 U.S. 415, 433 (1979); *Phelps,* 59 F.3d at 1064. The injuries caused and threatened by Rubinstein's ongoing actions to punish Peters for constitutionally protected activity are plainly immediate. *Dombrowski,* 380 U.S. at 489. Because of the societal importance of protecting an individual's free speech rights, the injuries are great. *Id.* at 486.

Whether Defendant's actions would chill a person of ordinary firmness from continuing her First Amendment activities is subject to an objective test. *Irizarry v.*

*Yehia,* 38 F.4th 1282, 1292 (10th Cir. 2022). It is a test "designed to weed out trivial matters…." *Garcia v. City of Trenton,* 348 F.3d 726, 728 (8th Cir. 2003). The lengths to which Rubinstein has gone constitute an extraordinary and coordinated attempt to deter Peters and her associates from persisting in political speech and the investigation of government misconduct. By any standard, Defendant's actions had a chilling effect on Peters. It is beyond reasonable dispute that being criminally prosecuted would objectively dissuade a person of ordinary firmness from continuing to engage in the activity that provoked the retaliatory prosecution.  Rubinstein's prosecution of Peters and involvement of FBI agents deterred Elbert County Clerk Dallas Schroeder and other county clerks from associating with Peters [Ex 6].  Before the FBI raids on the homes of Peters' and her political associate Sherronna Bishop, citizens were eager to associate with them.  After the raids, citizens were reluctant to do so [Ex 24 ¶¶ 41-42].

The injury that Peters must show to obtain preliminary injunctive relief need only be "likely." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). Peters has shown in her Complaint and her Declaration [Ex2] that there is more than a "subjective chill" of First Amendment rights. Peters will suffer irreparable injury if a preliminary injunction is not granted. *Roman Catholic*

*Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63, 67 (2020); *Dombrowski,* 380 U.S. at
485-86**.**

### c. Retaliatory Motivation

"The First Amendment bars a criminal prosecution where the proceeding is
motivated by the improper purpose of interfering with the defendant's
constitutionally protected speech." *P.H.E., Inc.,* 965 F.2d at 849. A prosecutor has
a "responsibility to refrain from improper methods calculated to produce a wrong
conviction as well as to use every legitimate means to bring about a just one."
*Harris v. People,* 888 P.2d 259, 263 (Colo. Sup. Ct. 1985) (*en banc*)

Rubinstein began investigating Peters on August 9, 2021, after Griswold's
Deputy, Christopher Beall, called and asked him to do so [Ex. 9 at 2].  Since then,
Rubinstein has retaliated against Peters in close coordination with Griswold.

Griswold's zeal to punish Peters for exercising First Amendment rights is
demonstrated by Election Order 2022-01, in which Griswold demanded that Peters
recant public statements about voting system equipment [Ex 26 ¶ 24]. When Peters
refused to recant her statements, Griswold carried out her threat to remove Peters
from office.  Griswold published a press release on January 18, 2022, announcing
the filing of a lawsuit to replace Peters as the Mesa County designated election
official, stating: "Clerk Peters' actions constituted one of the nation's first insider

threats where an official, elected to uphold free, fair, and secure selections risked the integrity of the election system **in an effort to prove unfounded conspiracy theories.**" [Ex. 27 at 2] (Emphasis added). That statement shows that Griswold's intended purpose was to punish Peters for exercising her First Amendment right to make a copy of the EMS server to document government misconduct. *See Irizarry,* 38 F.4th at 1290-96.

On February 14, 2022, Peters announced her candidacy for Colorado Secretary of State, making her a direct competitor for Griswold's office. [Ex. 2 ¶ 47]. On March 1, 2022, Peters presented her second petition to the County Board, asking them to stop using computer voting systems [Ex. 7]. Seven days later, Rubinstein announced the indictment of Peters [Ex. 8].

Rubinstein never investigated Griswold's destruction of election records during the Trusted Build installation, which shows his bias for Griswold and animus against Peters. While investigating Peters at Griswold's request, Rubinstein advised a lawyer representing Peters and her husband not to communicate with Peters because she was being investigated. [Ex. 2 ¶ 41; attorney email Ex. 5]. Rubinstein then indicted Peters 22 days after she announced her candidacy for Secretary of State, and one week after she presented her second

petition to the County Board.  After he indicted Peters, Rubinstein requested an outrageous $500,000 bond [Ex 2 ¶ 52].

When the court set bond at $25,000, Rubinstein insisted on bond conditions that effectively removed Peters from office.  She was prohibited from contacting any of her employees.  She could not enter her offices.  [*Id* ¶ 53; Bond Ex. 9 at 2]. The day after the bond hearing, Rubinstein's investigator made harassing telephone calls to Peters' 93 year old mother, her daughter, and her sisters.  [*Id* ¶ 54].  When Peters continued to speak publicly, Rubinstein filed a motion to revoke her bond [*Id* ¶¶ 55-56; Motion Ex. 10].  Peters appeared in a movie advocating election transparency.  Rubinstein opposed Peters' request to appear at the premiere, arguing that Peters "is seeking permission to leave the state so that she can be celebrated as a hero for the conduct that a grand jury has indicted her for." [Ex. 2 , ¶ 57; Motion Ex. 11].  Although Peters never failed to appear in court, Rubinstein advised the court that she was a "flight risk" when Peters asked court permission to use her passport to obtain TSA pre-check flight status for domestic travel [Ex. 2 ¶ 58; DA Response Ex. 12].  When Peters sent an email notice to 64 county clerks of her request for a recount of an election, Rubinstein claimed the email violated bond conditions, and persuaded the court to deny her travel requests.  [Ex. 2 ¶ 59; Order Ex. 13].

Like Griswold, Rubinstein sought to publicly discredit Peters and computer science experts who agreed with her.  Although Rubinstein had no expertise in computer science, he claimed implausibly that Peters' assistant, Sandra Brown, had interrupted ballot tabulation in two consecutive elections and caused the creation of new sets of ballots [See Rubinstein report Ex. 22, attempting to publicly discredit Peters' experts, refuted by Daugherity Declaration Ex. 19].

### d.  Bad faith

Peters must show an "unusual circumstance" to justify a preliminary injunction prohibiting Rubinstein from continuing to prosecute Peters. *Younger v. Harris,* 401 U.S. at 53. It is well established that one such circumstance is bad faith on the part of a governmental official in pursuing an investigation or prosecution. *Dombrowski,* 380 U.S. at 490; *Phelps,* 59 F.3d at 1066.  Prosecutorial bad faith is plainly present here.

In addition to the misrepresentations that Rubinstein's investigators made to the court (see p. 7 above), Rubinstein misinformed the grand jury that Peters' image of the server was "unlawfully downloaded" [Ex. 8 at 6].  As Griswold's Deputy testified, making a forensic image of an EMS server did not violate the law [Ex. 15 at 2 L. 14-17].

Rubinstein acted in bad faith by indicting Peters because he had no reasonable basis for believing he could obtain a valid conviction for the charges. *Kugler v. Helfant,* 421 U.S. 117, 126 n.6 (1975); *Fitzgerald,* 636 F.2d at 945. As a matter of law and fact, the indictment does not set out a *prima facie* case against Peters for the charges specified. Each count falls short of the pleading threshold required for a minimally sufficient indictment. "An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Hathaway*, 318 F.3d 1001, 1009 (10th Cir. 2003). As the U.S. Supreme Court has explained, "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117–18 (1974).

The Colorado Supreme Court has underscored this principle:

> A criminal indictment by a grand jury serves two essential purposes. First, the indictment must give the defendant sufficient notice of the crime that has allegedly been committed so that a defense may be prepared. Second, the indictment must define the acts which constitute the crime with sufficient definiteness so that the defendant may plead the resolution of the indictment as a bar to subsequent proceedings. To accomplish these purposes the indictment must clearly state the essential facts which constitute the offense. Fundamental fairness

requires no less. These requirements have been codified in Crim.P.
7(a)(2) which states: "Every indictment of the grand jury shall state the
crime charged and essential facts which constitute the offense."

*People v. Buckallew*, 848 P.2d 904, 909 (Colo. 1993). Allegations of essential facts

are absent from each count.

• Counts 1, 2 and 5 of the indictment charge violations of CRS § 18-8-306

(making an attempt to influence any public official by "deceit … with the intent

thereby to alter or affect the public servant's decision, vote, opinion, or action" a

Class 4 felony) with respect to Jess Romero, a voting systems manager from the

Secretary of State's Office ("SOS"), David Underwood, a Mesa County IT

employee, and Danny Casias, an SOS employee. For each of the three, the

indictment recites the text of the statute. [Ex. 8 at 3-4]. For Romero, the indictment

simply adds that he established procedures for the Trusted Build upgrade. [*Id* at 3].

For Underwood, the indictment alleges that he was the technician who put together

the temporary security identification for Wood. [*Id*] For Casias, it alleges only that

he met the consultant Peters identified as Wood. [*Id at 4*]. For none of the

individuals does the indictment even try to allege some specific "decision, vote,

opinion or action" within the meaning of the statute – i.e., some "formal exercise

of government power," *McDonnell v. United States*, 579 U.S. 550, 578 (2016) –

that Peters was supposedly trying to influence [*Id* at 3-4, 12].

So, too, the indictment fails to allege facts showing Peters acted with "deceit," which the law does not understand as being satisfied by just any misrepresentation. As the Colorado Supreme Court has explained, the statute does not define "deceit," so the Court derived its meaning from common usage:

> *Black's Law Dictionary* defines deceit as "[a] ***fraudulent*** and deceptive misrepresentation ... used by one or more persons to deceive and trick another, who is ignorant of the true facts, to the prejudice and damage of the party imposed upon." *Id.* at 405. Similarly, in *Webster's Third New International Dictionary* 584 (1986), deceit is defined as "any trick, collusion, contrivance, false representation, or underhand practice used ***to defraud*** another."

*People v. Janousek*, 871 P.2d 1189, 1196 (Colo. 1994) (emphases added).

The deceit condemned by this statute must have the purpose of ***defrauding*** someone, that is, "obtain[ing] money or property by false or fraudulent pretenses, representations or promises." *United States v. Kalu*, 791 F.3d 1194, 1204 (10th Cir. 2015)(quoting Tenth Circuit Pattern Jury Instruction 2.56). Peters' actions were not intended to deceive, but instead had the practical purpose of avoiding obstacles improperly created by officials who were trying to erase election records while preventing any copy from being preserved. The indictment fails to allege any facts that call into question Peters' good-faith and lawful motive. The indictment does not state that Peters made representations about Wood and Hayes to any "public servant" in order to obtain money or property from them. The necessary element of

26

§ 18-8-306 that Peters acted with "deceit" directed at accomplishing fraud is completely absent from the allegations against her.

• Counts 4, 6, and 7 charge Peters with criminal impersonation and a conspiracy to commit criminal impersonation in violation of CRS §§ 18-5-113(1)(B)(1) and 18-2-201. These counts also appear to arise from Hayes' use of Wood's access badge, but once again the indictment fails to give the minimally sufficient detail to describe what the charge really is. For example, the indictment claims the defendants used Woods' identification "to further their criminal scheme," [*Id* at 7], but never describes what that scheme was. Count 6 appears to allege that Peters impersonated Wood, [*Id* at 4] but no factual detail is supplied as to how this impersonation occurred. Count 6 claims that Wood is somehow subject to "various forms of liability and criminal exposure" because of Peters' conduct, but never explains what that exposure could be. [*Id*]. As to conspiracy, Count 7 identifies as conspirators *possibly* Sandra Brown and *possibly* persons *unknown* to the Grand Jury and the District Attorney. [*Id* at 4]

The Colorado Supreme Court has been careful to circumscribe the criminal impersonation statute to avoid any constitutional vulnerability for overbreadth. As the Court noted:

> Certainly, there are lawful uses of assumed fictitious identities, as was recognized by the legislature when it drafted the statute and limited the

> proscription to those false impersonations undertaken to accomplish
> ***unlawful*** purposes. In view of this limitation, the statute cannot be said
> to sweep unreasonably broadly and proscribe protected conduct, as
> contended by appellant.

*People v. Gonzales*, 534 P.2d 626, 628 (Colo. 1975)(emphasis in original).

Thus, this "statute … defines criminal impersonation as assuming a false or fictitious identity or capacity, and in that identity or capacity, doing any act with intent to unlawfully gain a benefit or injure or defraud another." *People v. Brown*, 562 P.2d 754, 756 (Colo. 1977). Impersonation as occurred in this case -- not designed to secure an unlawful benefit or to injure or defraud – does not qualify as a criminal impersonation used to secure some benefit. As one appellate court explained:

> Although some cases addressing criminal impersonation have found
> that the intent to defraud could be inferred from the surrounding
> circumstances … those cases cannot be read as standing for the
> proposition that criminal intent is invariably to be inferred whenever
> false identifying information is given to police. Indeed, in *People v.
> Shaw, …* a conviction for criminal impersonation based on the
> defendant's having given a false name to an arresting officer was
> reversed because the prosecution had failed to present evidence that the
> use of the false name would result in a benefit to the defendant.

*People v. Johnson*, 30 P.3d 718, 723 (Colo. App. 2000).

Finally, Wood agreed to supply his identification to Hayes. [Ex. 2 ¶ 25].  It is not true that "impersonation" of Wood was undertaken without his permission.

• Count 8 also arises from the use of Wood's access badge, charging Peters with "identity theft" in violation of C.R.S. § 18-5-902(1)(A), which makes it a crime to use the "personal identifying information, financial identifying information or financial device of another without permission or lawful authority with the intent to obtain cash, credit, property, services, or any other thing of value or to make a financial payment." *See also* C.R.S. § 18-1-901 ("'Thing of value' includes real property, tangible and intangible personal property, contract rights, choses in action, services, confidential information, medical records information, and any rights of use or enjoyment connected therewith."). It is beyond dispute that Peters did not act with the intent to acquire cash or anything else of value within the meaning of the statute. This charge is so utterly unfounded it demonstrates Rubinstein's bad faith.

The indictment mentions the use of only two items associated with Wood --: a key card access badge and a "Yubikey" -- but it does not explain how either item qualifies as "personal identifying information, financial identifying information or [a] financial device" within the meaning of the statute. *See* C.R.S. § 18-5-901(13) (defining "personal identifying information"); C.R.S. § 18-5-901(7) (defining "financial identifying information"); C.R.S. § 18-5-901(6) (defining "financial device").

The Yubikey is something like a thumb drive, was not used by anyone, and so cannot be the basis for this count. While the access badge did have Wood's name on it, this only identified who the badge was assigned to;  it did not make the access card a form of personal identification. Access cards were often issued simply labelled "Temp 1," "Temp 2," and so on, for vendors and others who were not county employees [Ex 2 ¶ 27], so the badge did not represent and was not linked to somebody of detailed identifying information filed somewhere. In truth, the badge functioned more like a modern electronic hotel room key. It is a temporary pass giving the bearer access to certain facilities. It is not the kind of "personal identifying information" that can be stolen within the understanding of § 18-5-902. Even if the access badge does qualify as "personal qualifying information" under § 18-5-902, Wood gave his permission for it to be used by Hayes [Ex. 2 ¶ 25], so no impersonation or "theft" of Wood's identity took place.

• Count 9 charges Peters with first degree official misconduct in violation of C.R.S. § 18-8-404(1). An official violates this statute:

> if, with intent to obtain a benefit for the public servant or another or maliciously to cause harm to another, he or she knowingly:
>
> (a) Commits an act relating to his office but constituting an unauthorized exercise of his official function; or
>
> (b) Refrains from performing a duty imposed upon him by law; or

(c) Violates any statute or lawfully adopted rule or regulation relating to his office.

The indictment relies exclusively on the text of the statute to make this charge, which is fatally insufficient without more substantiating allegations. Most importantly, this offense must be undertaken to "obtain a benefit" or to "maliciously cause harm to another." The importance of this required specific intent is illustrated by the Colorado Supreme Court's reversal of a county tax collector's conviction for this offense in *People v. Dilger,* 585 P.2d 918 (Colo. 1978). The tax collector had been approaching various commercial taxpayers seeking to collect a penalty for the nonpayment of taxes, when, as it turned out, those taxpayers were actually not delinquent in their tax payments. And these field visits were contrary to the procedures of the tax assessor's office. As the Court explained in reversing the conviction:

> We find that in the present case the requisite element of "intent to obtain a benefit for himself or maliciously to cause harm to another" was not proved beyond a reasonable doubt. Both of the principal witnesses for the prosecution … admitted that the defendant never asked or even implied that they pay him any money. There is therefore no direct evidence that the defendant sought to obtain a monetary or other benefit for himself….
>
> While specific intent may be inferred circumstantially, mere conjecture of intent is not acceptable in lieu of proof beyond a reasonable doubt…. Evidence showing that a tax collector approached nondelinquent taxpayers and requested an unusual means of payment

does not establish beyond a reasonable doubt intent to obtain personal benefit.

*Id.,* at 919-20. *See also* B. Covington, *State Official Misconduct Statutes and Anticorruption Federalism After Kelly v. United States*, 121 Colum. L. Rev. 273, 283 & n. 63 (2021) (citing *Dilger*) (element of specific intent "provide[s] defendants with a valid defense if they acted in good faith for the public benefit but did so mistakenly.").

Missing here are any factual allegations to support this element of the offense. Peters complied with federal (and state) law when she made a backup copy of election records before they were destroyed by the Trusted Build installation, which erased those records. There is no evidence that Peters acted from any of the corrupt motives required by C.R.S. § 18-8-404(1).

Beyond the issue of specific intent, a fatal lack of specificity permeates this count. The indictment states that Peters acted to benefit someone or to cause harm to someone, but there are no factual allegations to support such a claim. Who was benefited? Who was harmed? Similarly, the indictment alleges she took an act that was an "unauthorized exercise of her official function," but never says what that act was. The indictment sets out various general characterizations of Peters' conduct using "and/or" phrasing, which means Peters cannot know what specifically she is accused of doing. The indictment does not even specify the

statute or regulation Peters supposedly violated – if, of course, the indictment is

actually charging that aspect of the offense, which one cannot know from the text

of the indictment.  The absence of rudimentary factual detail renders Count 9 a

nullity as a matter of law.

• Count 10 charges a violation of CRS § 1-13-107(1), alleging that "Tina

Peters was a public officer, election official, or other person upon whom any duty

is imposed by this code who then violated, neglected, or failed to perform such

duty or is guilty of corrupt conduct in the discharge of the same." Yet this Count

fails to put Peters on notice of the alleged illegal conduct that forms the basis for

her indictment for a "violation of duty." Strikingly, the indictment does not even

specify the duty at issue in this charge. And again, the indictment is punctuated by

"or," and so the precise wrongdoing at issue is not identified. According to the

indictment, Peters *either* violated an unnamed duty, *or* she in some way neglected

it, *or* she failed to perform it altogether, *or* she engaged in unspecified "corrupt

conduct in the discharge" of that mystery duty.

Earlier on, the indictment cites two rules concerning access to secure areas,

Rules 20.5.3(a) and 20.5.5, (Indictment, at 9), but does not expressly link them to

this Count or otherwise allege facts establishing a violation of those rules.

Importantly, the indictment fails to mention Rule 20.5.3(b), which provides that

"no other individuals may be present in these locations *unless supervised by one or more employees with authorized access*." (emphasis added). Since there is no allegation that Hayes was unaccompanied by Peters, who had authorized access, no violation of this Rule could have occurred.

• Finally, Count 11 charges a violation of C.R.S. § 1-13-114, alleging that "Tina Peters willfully interfered or willfully refused to comply with the rules of the Secretary of State or the Secretary of State's designated agent in carrying out of the powers and duties proscribed [sic] in section 1-1-107, C.R.S." Absent is a "statement of the facts and circumstances as will inform the accused of the specific offense … with which he is charged." *Hamling,* 418 U.S. at 118. There is no identification of the rules that are at issue here, much less a specific description of facts indicating that Peters interfered or refused to comply with them.  Though the indictment claims Peters did not comply with "all" of the requests or directives in an Election Order of the Secretary of State, that simply means that Peters did in fact comply with some, but those she allegedly did not comply with are not disclosed.

However, we do know – and the indictment does not suggest otherwise -- that all of Peters' acts were directed at ensuring election records were preserved as required by federal and Colorado law. 52 U.S.C. § 20701; CRS § 1-7-802. If there

were any rules or administrative directives with which Peters did not comply, those rules and directives were subordinate to Peters' statutory obligations. Peters' compliance with them under the circumstances would have improperly advanced a criminal scheme to destroy election records in violation of the governing statutes. It is an elementary proposition of law that "the Secretary of State does not have authority to promulgate rules that conflict with other provisions of law." *Gessler v. Colorado Common Cause*, 327 P.3d 232, 235 (Colo. 2014). *See also Hanlen v. Gessler*, 333 P.3d 41, 49 (Colo. 2014) ("[T]he Secretary's power to promulgate rules regarding elections is not without limits. Specifically, the Secretary lacks authority to promulgate rules that conflict with statutory provisions."); CRS § 24-4-104(4)(b)(IV) ("No rule shall be adopted unless … [t]he regulation does not conflict with other provisions of law."); C.R.S. § 24-2-103(8)(a) ("Any rule … which conflicts with a statute shall be void."); C.R.S. § 24-4-106(7) (requiring courts to set aside agency actions that are "contrary to law"). Thus, any rules or administrative directives violated by Peters in the context of this case were utterly void and cannot provide a basis for the alleged violation of C.R.S. § 1-13-114.

### e. Peters is unlikely to receive a fair trial in state court

Another basis for enjoining a state prosecution is that there will likely be no adequate opportunity for the plaintiff to be heard on her federal constitutional

claims or defenses. *Kugler v. Helfant,* 421 U.S. 117, 124 (1975) ("Only if extraordinary circumstances render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process."); *Younger,* 401 U.S. at 45; *Amalgamated Fed. Emp. Union Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 328-29 n. 3 (1068) (Black, J., dissenting); *Dombrowski,* 390 U.S. at 486. In this case, the June 5, 2022, ruling by Judge Matthew D. Barrett on a motion to quash subpoenas *duces tecum* in *People v. Peters,* Case No. 22CR371 effectively precludes reliance by Peters on federal constitutional defenses that she is entitled to assert. Judge Barrett ruled that the records sought by Peters' subpoena were not material to the issues pending in Peters' criminal case and further:

> The jury will not be asked to address any questions regarding the functioning of election equipment.

> [A]ny report regarding the verity of the election equipment made by her experts, or any counter expert, is entirely irrelevant. These reports make no issue of material fact in this case more or less likely. This criminal case is not the forum for these matters.

> Choice of evil is a statutory defense and is only applicable when the alleged crimes were necessary as an emergency measure to avoid an imminent public or private injury that was about to occur by reason of a situation occasioned or developed through the conduct of the actor and which is of sufficient gravity to outweigh the criminal conduct.

[Ex 16 at 3].  These rulings will preclude Peters from asserting defenses based on the First and Fourteenth Amendments, as well as the Supremacy Clause.

### B. Peters Will Suffer Irreparable Injury Without Preliminary Relief

The first two *Winter* factors are the most critical. *Nken,* 556 U.S. at 434. The second factor is that Peters must show that she is likely to suffer irreparable harm if preliminary injunctive relief is not granted. *Benisek v. Lamone.* 138 S. Ct. 1942, Peters has previously described on pages 14-15 the irreparable injury that she will continue to suffer unless her motion for preliminary injunctive relief is granted.

### C. The Balance of Equities Favors Peters.

The third *Winter* factor, whether the balance of the equities favors the moving party, is considered together with the fourth factor, whether an award of a motion for preliminary injunction would serve the public interest, when Government is the opposing party. *Nken,* 556 U.S. at 435.

The protection of individual constitutional rights always serves the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins,* 916 F.3d 792, 807 (10th Cir. 2018); *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012)*.* Peters' interest in vindicating her rights to free speech, to free association, and to petition the government for the redress of grievances guaranteed by the First Amendment outweighs Defendants' interest in pursuing criminal proceedings against her,

particularly given the absence of justification for investigating and charging Peters based on the statutes they cite. *See Bass,* 365 F.3d at 1089; *Utah Licensed Beverage Ass'n v. Leavitt,* 256 F.3d 1061, 1076 (10th Cir. 2001). The Seventh Circuit has noted: "In First Amendment cases, 'the likelihood of success on the merits will often be the determinative factor.' " *ACLU of Illinois v. Alvarez,* 679 F.3d 588, 589 (7th Cir. 2018).

The public interest would be served by granting preliminary relief in this case. "[T]he public interest…favors plaintiffs' assertion of their First Amendment rights." *Elam Constr., Inc. v. Regional Transp. Dist.,* 129 F.3d 1343, 1347 (10th Cir. 1997)); *see AT&T Co. v. Winbach and Conserve Program, Inc.,* 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994): "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."

## CONCLUSION

The Court should enter an Order granting a preliminary injunction prohibiting Defendant Rubinstein from further prosecution, investigation, or harassment of Peters.

Respectfully submitted November 27, 2023

s/*John Case*

John Case

John Case, P.C.
6901 South Pierce St. #340
Littleton CO 80128
Phone|303-667-7407
brief@johncaselaw.com
Co-Counsel for Plaintiff

Patrick M. McSweeney
Robert J. Cynkar
Christopher I. Kachouroff
Lyndsey L. Bisch
*McSweeney, Cynkar & Kachouroff, PLLC*
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
FAX (877) 598-4668
Co-Counsel for Plaintiff

## CERTIFICATE OF LENGTH

Undersigned counsel certifies that the foregoing Motion and Memorandum consists of 8825 words, exclusive of caption, signature block, and tables.

s/*John Case*
John Case

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that the foregoing Motion and Memorandum will be personally served upon the Defendant Daniel P. Rubinstein with a copy of the Summons and Complaint and all exhibits on November 27, 2023.

s/*John Case*
John Case